**JS-6**

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE MERUELO MADDUX PROPERTIS, INC. | CASE NO.<br>2:11-cv-5458-SVW<br>2:11-cv-5577-SVW<br>2:11-cv-5655-SVW<br>2:11-cv-5832-SVW<br><br>**IN CHAMBERS ORDER Re APPEAL [1]** |

## I.    INTRODUCTION

Meruelo Maddux Properties, Inc. ("MMPI") was incorporated in 2006.  Richard Meruelo was Chief Executive Officer and Chairman of the Board; John Maddux was President, Chief Operating Officer, and a Board Member.  In 2007, MMPI completed its initial public offering, after which Meruelo owned approximately 39,911,378 shares, representing 45.3 percent of outstanding shares, and Maddux (and related entities) owned approximately 5,797,588 shares, or 6.6 percent of outstanding shares.  Together, Meruelo and Maddux owned about 51.9% of MMPI's approximately 88 million shares of outstanding common stock.[1]

_____

[1] The Court refers to Meruelo and Maddux as the "Insider Equity Holders," as they controlled a majority of MMPI's shares, and were also MMPI officers and members of the MMPI Board.

1

On March 26 and 27, 2009, MMPI and 53 of its subsidiary companies filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  In 2009 and 2011, the Insider Equity Holders (essentially, Meruelo and Maddux) proposed a series of reorganization plans; none were accepted by the Bankruptcy Court. ER 1830-1837.[2]  In June of 2010, the Bankruptcy Court gave Charlestown, a MMPI shareholder that owned approximately 2 percent of the corporation (or 1,762,800 shares) the opportunity to propose a competing plan.  ER 1831.  In August of 2010, the Bankruptcy Court gave Legendary Investors Group No. 1, LLC and East West Bank (together the "Legendary" group) the opportunity to propose a competing plan.  ER 1832.[3]  The Insider Equity Holders, Charlestown, and Legendary each proposed a series of amended plans.  ER 1832-1838.  On January 27, 2011, the Bankruptcy Court began a trial as to the Final Proposed Charlestown Plan, and the Final Proposed Insider Equity Holders' Plan.[4]  ER 1838.  During the course of the trial, each party proposed modifications to their respective plans.  Id. At a hearing held on May 19, 2011, the Bankruptcy Court announced

---

[2] "ER" refers to the excerpts of record.

[3] It is unclear whether the Legendary group was somehow involved in MMPI before it filed its petition (as a lender or equity interest holder).

[4] Trial did not commence as to the final plan proposed by Legendary; after the trial began, the Legendary group withdrew its final proposal.  ER 1838.

1 that it would confirm the Final Proposed Charlestown Plan, with one

2 Court-imposed modification discussed below.   ER 1152.

3       As proposed, the Final Charlestown Plan was "fully consensual"

4 as to all creditors,[5] and provided that MMPI would come out of

5 bankruptcy as a newly formed corporation.[6]   ER 1890.   The Plan

6 further divided the pre-petition equity interests into two classes—

7 stock held by Meruelo, Maddux, and other officers of MMPI (the

8 Insider Equity Holders) and stock held by all others (the "Non-

9 Insider Equity Holders").[7]   The Final Charlestown Plan gave both

10 Insider and Non-Insider Equity holders the option of either 1)

11 retaining their existing shares in the reorganized corporation; or,

12 2) exchanging their shares for 35 cents apiece, with an important

13 caveat discussed in the following paragraph.   Charlestown argued

14 that 35 cents a share was the "price on which a buyer and seller

15 would agree in an arm's length transaction."   ER 1880.   In support

16

17 _____

18     [5] A plan is "consensual" as to a creditor's pre-petition
interest if it either 1) pays the creditor in full; or, 2) is agreed

19 to by an "impaired" creditor.   Generally, a creditor's claim "is
considered 'impaired' for purposes of voting on a Chapter 11 plan

20 unless the plan leaves the creditor's legal, equitable, and
contractual rights unaltered, or the debtor 'cures' any default that

21 occurred prior to or during the bankruptcy case."   Gen. Elec.
Capital Corp. v. Future Media Prods., Inc., 547 F.3d 956, 960 (9th

22 Cir. 2008) (citing 11 U.S.C. § 1124).

23     [6] The newly formed corporation is EVOQ Properties, Inc.   As

24 discussed below, after the Bankruptcy Court approved the Final
Charlestown Plan, a newly formed LLC—MMPI Acquisition—owned 55

25 percent of EVOQ.

26

27     [7] Charlestown was only one of several members of the Non-Insider
Equity Holders, as it owned 2% of pre-petition MMPI shares.

28

1  of this assertion, Charlestown offered the testimony of Stephen

2  Taylor, the chairman of the Official Committee of Equity Holders

3  (the "OEC").  ER 1880. [8]  During the confirmation trial, the Insider

4  Equity Holders argued that 35 cents a share proposed by Charlestown

5  undervalued the stock of the reorganized debtor.  In support of

6  their contention, the Insider Equity Holders offered the declaration

7  of M. Freddie Reiss, a senior managing director at FTI Consulting,

8  Inc.  ER 847-858.  However, Reiss's declaration did *not* offer an

9  opinion as to the value of the reorganized stock.  Instead, he

10  stated only that the *Insider Equity Holders'* estimate of the value

11  of the reorganized corporation was $278.4 million, and that, based

12  on this estimate, 35 cents a share undervalued the stock.[9]  ER 849-

13

---

14  [8] Under the Bankruptcy Code, the Bankruptcy Court may, "on
15  request of a party in interest," appoint a committee of "equity
    holders if necessary to assure adequate representation of . . .
16  equity security holders."  11 U.S.C. § 1102(a)(2).  Different groups
    of equity holders may request appointment of their own committee.
17  See In re Drexel Burnham Lambert Grp., Inc., 118 B.R. 209, 212
    (Bankr. S.D.N.Y. 1990) ("[T]he chief concern of adequacy of
18  representation is whether it appears that different classes of debt
    and equity holders may be treated differently under a plan and need
19  representation through appointment of additional committees.").  The
    OEC was appointed by the Office of the United States Trustee in July
20  of 2010, and the members changed during the course of the
    proceedings in the Bankruptcy Court.  ER 1829.  It is unclear from
21  the record who sat on the OEC, although it appears that the OEC
    represented *Non-*Insider Equity Holders.  See ER 1890 (commenting
22  that the OEC was the "official representative" of the Non-Insider
23  Equity Holders).  Moreover, there is no evidence in the record that
    the Insider Equity Holders requested appointment of their own,
24  separate, committee.

25

26  [9] As the Insider Equity Holders repeatedly argue in their
    briefs, if the value of the reorganized debtor was $278 million, if
27  the value of the reorganized debtor was $278 million, the per share
    price should have been $3.16 ($278 million/88 million shares of pre-
28  petition stock).

1  850.  Reiss's declaration does not state how the Insider Equity

2  Holders arrived at their conclusion that the reorganized corporation

3  was worth $278 million.

4   As noted above, the Final Charlestown Plan included one

5  additional requirement as to the equity interest holders.  Under the

6  proposed plan, at least 55 percent of existing stock would have to

7  be sold to a newly formed entity—MMPI Acquisition, LLC.[10]  Thus, any

8  equity holder (whether Insider or Non-Insider) that chose *not* to

9  sell its shares would be forced to sell its shares on a pro-rata

10  basis until the newly formed MMPI Acquisition owned 55 percent of

11  stock in the newly formed corporation.[11]  In exchange for this equity

12  interest, MMPI Acquisition would contribute $23.6 million in cash to

13  be "used first to purchase 55% of the shares of MMPI Existing Common

14  Stock for $0.35 per share," with "[t]he remainder of such $23.6

---

[10] The Insider Equity Holders contend that Charlestown owned
MMPI Acquisition; however, their citations to the record establish
only that MMPI Acquisition was the proposed purchaser of a 55
percent interest in the reorganized debtor, *not* that Charlestown own
MMPI Acquisition.  Moreover, even assuming that Charlestown did own
MMPI Acquisition, it does not change this Court's analysis.

[11] For example, suppose that, pre-petition, there had been three
stockholders in MMPI: the first, stockholder A, owned 10 percent;
the second, stockholder B, owned 30 percent; and the third,
stockholder C, owned 60 percent.  Now assume that stockholder A
decides to sell all of her stock to the newly formed MMPI
Acquisitions, but that stockholders B and C chose not to.  The Final
Charlestown Plan required stockholders B and C to sell, on a pro-
rata basis, enough of their shares for MMPI Acquisition to gain
ownership over an additional 45 percent.  As applied to this
example, it would require stockholders B and C to each sell half of
their shares, and the resulting ownership structure would give MMPI
Acquisition 55 percent of the newly formed corporation, stockholder
B 15 percent, and stockholder C thirty percent.

1  million [to be] used for any corporate purpose." SER 801.[12]  MMPI
2  Acquisition had also obtained a commitment for a secure loan in the
3  amount of $15 million to use "in funding the operations and payments
4  under the Charlestown Plan." SER 801-802.  Because the Insider
5  Equity Holders did not wish to sell their shares, the proposed Final
6  Charlestown Plan had an additional consequence.  As the Bankruptcy
7  Court concluded, "[t]he practical effect of this treatment is that
8  some equity holders who chose to retain their stock under the [Plan]
9  will have to sell a portion of their shares for $0.35.  The further
10 implication is that current 'insider' shareholders, who hold more
11 than 50 [percent] of the common stock, will become minority
12 shareholders." ER 982.[13]

13     By contrast, the Final Proposed Insider Equity Holders' plan
14 would have impaired nearly $70 million of secured debt over those
15 creditor's objections. ER 1891.  An additional $60 million worth of
16 secured debt indicated that, although it was amenable to either
17 plan, it preferred the Final Charlestown Plan.  Id.  Moreover, the
18 Final Proposed Insider Equity Holders' Plan would have provided all
19 pre-petition equity interests $0.25 a share.  ER 1877.

[12] "SER" refers to the supplemental excerpts of record.

[13] It is unclear from the record how many shareholders
voluntarily sold their shares, and how many were forced to sell
them, and which shareholders owned what percentage of the newly
organized corporation after the Bankruptcy Plan was confirmed.  What
is certain is that MMPI Acquisition owned 55 percent of the new
corporation as a result of the confirmation of the Plan, and that
Meruelo and Maddux became "minority" shareholders.

6

1    As noted above, the Bankruptcy Court made one modification to

2    the proposed Final Charlestown Plan.   In response to the Insider

3    Equity Holders' contention that the 35 cents a share proposed by the

4    Final Charlestown Plan undervalued the reorganized corporation's

5    stock, the Bankruptcy Court required MMPI Acquisition to pay Insider

6    Equity Holders—but *not* Non-Insider Equity Holders—45 cents a share

7    for each share sold.   The Bankruptcy Court notified the parties that

8    it would be awarding Insider Equity Holders this price in a

9    tentative ruling issued the day of the final confirmation hearing.

10   ER 981-985.   In determining that this was the appropriate price,

11   the Bankruptcy Court took judicial notice of the fact that there was

12   an "over the counter market for MMPI shares," and that on May 18,

13   2011, "the day prior to the Court's ruling confirming the

14   Charlestown Plan," shares of MMPI traded at "$.45 a share with a

15   trading volume in 23,700 shares (and with a volume as high as

16   179,000 shares as recently as March 21, 2011)."   ER 1881.   In

17   relying on the "pink sheet"[14] price of $.45 a share as an accurate

18   value of the stock, the Bankruptcy Court further relied upon

19   evidence indicating that in February of 2011, "some 300,000 shares"

20   of MMPI stock were sold for an average of $.50 a share.   Id.

21   With this adjustment, the Bankruptcy Court confirmed the Final

22   Charlestown Plan.   In its written order confirming the plan, the

23

24   [14] "Pink sheets refer to a securities trading system that is not
25   regulated by the Securities and Exchange Commission.   Companies are
     not required to file periodic reports or audited financial
26   statements."   Gearing v. China Agritech, Inc., 2012 WL 2890806, at
     *1 (C.D. Cal. July 16, 2012).

27

28

1  Bankruptcy Court found that the Final Charlestown Plan met the
2  Code's requirements for confirmation.  See 11 U.S.C. § 1129.  Among
3  other things, the Bankruptcy Court found that the Final Charlestown
4  Plan treated the Insider Equity Holders' interest "fairly and
5  equitably" as required by Section 1129(b).

6      On appeal, the Insider Equity Holders make two arguments.
7  First, they contend that the Bankruptcy Court's conclusion that the
8  plan was "fair and equitable" was erroneous.  Specifically, the
9  Insider Equity Holders argue that the Bankruptcy Court erred by
10  relying on the pink sheets to assess the value of the reorganized
11  debtors' stock.  Secondly, the Insider Equity Holders argue that it
12  was procedurally incorrect for the Bankruptcy Court to rely on the
13  pink sheet trading price, both because it was not evidence in the
14  record and because the late hour at which it informed the parties
15  that it would be relying on the pink sheet price gave the Insider
16  Equity Holders insufficient time to prepare and present evidence as
17  to why that valuation figure was incorrect.

18  **II.   STANDARD OF REVIEW**

19

20      This Court reviews the Bankruptcy Court's "interpretation of
21  the Bankruptcy Code de novo and its factual findings for clear
22  error."  Blausey v. U.S. Tr., 552 F.3d 1124, 1132 (9th Cir. 2009);
23  see also In re Cogar, 210 B.R. 803, 808 (B.A.P. 9th Cir. 1997) ("An
24  order approving a reorganization plan is reviewed for an abuse of
25  discretion.  A court abuses its discretion when it bases its
26  decision on an erroneous view of the law or a clearly erroneous view
27  of the facts.") (internal citation and quotation marks omitted).
28

8

1   Appellants do not take issue with the plan of reorganization,

2   *except* for the valuation methodology employed by the Bankruptcy

3   Court.  Valuation questions are mixed questions of law and fact.

4   See In re Ebbler Furniture and Appliances, Inc., 804 F.2d 87, 89

5   (7th Cir.1986).  "The bankruptcy court's selection and application

6   of valuation methodology is primarily a legal matter," and thus

7   subject to *de novo* review, "whereas the findings made under the

8   selected valuation standard are factual," and thus reviewed for

9   clear error.  Nat'l Rural Utilities Co-op. Fin. Corp. v. Wabash

10  Valley Power Ass'n, Inc., 111 B.R. 752, 767 (S.D. Ind. 1990) (citing

11  Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.

12  v. Anderson, 390 U.S. 414, 445 (1968)).

13  Finally, as this Court "functions as an appellate court in

14  reviewing a bankruptcy decision and applies the same standards of

15  review as a federal court of appeals, [it] may also affirm a

16  bankruptcy's order on any ground supported by the record."  In re

17  Crystal Properties, Ltd., L.P., 268 F.3d 743, 755 (9th Cir. 2001)

18  (internal citations and quotation marks omitted).

19  **III. DISCUSSION**

20  **A. Fair and Equitable**

21  Before confirming a bankruptcy plan, a bankruptcy court has an

22  "an affirmative duty to ensure that the [p]lan satisfie[s] all 11

23  U.S.C. § 1129 requirements for confirmation."  In re Ambanc La Mesa

24  Ltd. P'ship, 115 F.3d 650, 653 (9th Cir. 1997).  Plan proponents

25

26

27

28

9

1  have the burden of proving by a preponderance of the evidence that a

2  plan meets these requirements.  Id.[15]

3      Section 1129 provides two avenues through which a plan

4  proponent may demonstrate compliance with Section 1129.  First, the

5  proponent may demonstrate that the plan satisfies each of Section

6  1129(a)'s requirements.  In re Ambanc, 115 F.3d at 653; see also 11

7  U.S.C. § 1129(a) ("The court shall confirm a plan only if all of the

8  following requirements are met . . . .").  Among other things,

9  Section 1129(a) requires that each impaired class of creditors and

10  shareholders accepts the plan.  See 11 U.S.C. § 1129(a)(8) ("With

11  respect to each class of claims or interests, (A) such class has

12  accepted the plan; or (B) such class is not impaired under the

13  plan.").[16]

14      The second path to approval is known as the "cramdown"

15  alternative, and is set forth in Section 1129(b).  For a plan to be

16  confirmed under Section 1129(b), a plan proponent must first

17  demonstrate that that the plan meets all of Section 1129(a)'s

18  criteria *except* the eighth.  See In re Ambanc, 115 F.3d at 653

19  (holding that a bankruptcy court must confirm a plan if "the Plan

20  satisfies all thirteen requirements of 11 U.S.C. § 1129(a)," or "if

21  the only condition not satisfied is the eighth requirement, 11

---

23  [15] The Bankruptcy Code permits "[a]ny party in interest,"
24  including an "equity security holder" to file a plan under certain
   conditions.  11 U.S.C. § 1121(c).  There is no dispute that
25  Charlestown was permitted to propose a plan under the Bankruptcy
   Code.

27  [16] Because this requirement is listed in Section 1129(a)(8), it
   is often referred to as the "eighth" requirement.

U.S.C. § 1129(a)(8), the Plan satisfies the 'cramdown' alternative to this condition found in 11 U.S.C. § 1129(b)"); see also In re Paige, 685 F.3d 1160, 1183 (10th Cir. 2012) (same).  If the plan satisfies all of Section 1129(a)'s requirements other than the eighth, then it may be approved *if* it complies with Section 1129(b)(1).  Section 1129(b)(1) provides that a plan may be approved if it does not "discriminate unfairly" against each impaired class that has not accepted the plan, and treats each such class "fair[ly] and equitabl[y]."  11 U.S.C. § 1129(b)(1); see also In re Ambanc, 115 F.3d at 653.[17]

The phrase "fair and equitable" "is not a vague exhortation to bankruptcy judges that they do the right thing[.]"  In re Perez, 30 F.3d 1209, 1212 (9th Cir. 1994).  Rather, the term "reflect[s] and stand[s] proxy for almost a century of judicial decision-making, and over half a century of legislative guidance."  7 COLLIER ON BANKRUPTCY § 1129.03[4] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2009) (hereinafter, "COLLIER").  Principally, the fair and equitable requirement "implements the so-called absolute priority rule, under which an objecting class must be paid in full before any claim or interest junior to it gets anything at all."  In re Perez, 30 F.3d at 1212-13; see also In re Castleton Plaza, LP, 707 F.3d 821, 821 (7th Cir. 2013) ("Creditors in bankruptcy are entitled to full payment before equity investors can receive anything.  This is

---

[17] The Insider Equity Holders do not argue that the Final Charlestown Plan unfairly discriminated against their interest.

1    the absolute-priority rule."). The absolute priority rule has been

2    codified at Section 1129(b)(2),[18] which provides in relevant part:

3         For the purpose of this subsection, the condition that a plan

4         be fair and equitable with respect to a class includes the

5         following requirements . . .

6              (C) With respect to a class of interests—

7

8                   (i)  the  plan  provides  that  each  holder  of  an
                    interest  of  such  class  receive  or  retain  on

9                   account  of  such  interest  property  of  a  value,
                    as  of  the  effective  date  of  the  plan,  equal  to

10                  the  greatest  of  the  allowed  amount  of  any  fixed
                    liquidation  preference  to  which  such  holder  is

11                  entitled,  any  fixed  redemption  price  to  which
                    such  holder  is  entitled,  or  the  value  of  such

12                  interest; *or*,

13

14                  (ii) the  holder  of  any  interest  that  is  junior  to
                    the  interests  of  such  class  will  not  receive  or

15                  retain  under  the  plan  on  account  of  such  junior
                    interest  any  property.

16   11 U.S.C. § 1129(b)(2)(C) (emphasis added).[19]

17        In this case, the Insider Equity Holders do *not* argue that the

18   Final Charlestown Plan violated the absolute priority rule.  Nor

19   could they: under the Final Charlestown Plan, *no class junior to the*

20   *Insider Equity holders received anything of value.*  In the language

21

22        [18]  Although Section 1129(b)(1) "sets forth a complete test for

23   nonconsensual confirmation, Congress added [Section 1129(b)(2)] to
     illustrate some of the components of the fair and equitable rule."

24   COLLIER § 1129.04.

25

26        [19] 1129(b)(2)(C) details the minimum requirements that a plan
     must meet if it impairs an objecting class of *equity* interests.

27   1129(b)(2)(A) and (B) detail the requirements for impaired,
     objecting classes of secured and unsecured creditors, respectively.

28

                                    12

of the statute, *no* "holder of any interest that is junior to" the
Insider Equity holder's "receive[d] or retain[ed]" any property on
account of such junior interest in the property.  11 U.S.C. §
1129(b)(2)(C)(ii).

Instead, the Insider Equity Holders argue—and the Bankruptcy
Court agreed—that, in these circumstances, Section 1129(b)'s "fair
and equitable" requirement demanded that they receive the "fair
market value" of the stocks they were forced to sell.[20]  Because the

---

[20] As an initial matter, it appears that the Bankruptcy Court's
holding that the Insider Equity Holders were required to receive the
"fair market value" of their stock *if* the Final Charlestown Plan
complied with Section 1129(b)(2)(C)(ii) was an incorrect reading of
the statute.  Section 1129(b)(2)(C) provides that a plan may comply
with the absolute priority rule *either* by providing each holder of
an impaired interest that objects to a plan with "the value of such
interest,"  11 U.S.C. § 1129(b)(2)(C)(i), *or* by ensuring that no
interests junior to the Insider Equity Holders "receive[d] or
retain[ed] [any property] under the plan on account of such junior
interest."  11 U.S.C. § 1129(b)(2)(C)(ii).  By mandating that the
Insider Equity Holders receive the "fair market value" of their
stock, the Bankruptcy Court effectively transformed the word "or" in
Section 1129(b)(2)(C) into an "and," an interpretation at odds with
the plain language of the statute.  See In re Philadelphia
Newspapers, LLC, 599 F.3d 298, 305 (3d Cir. 2010) ("The use of the
word 'or' in [Section 1129(b)(2)(A), the provision detailing how a
plan may meet the fair and equitable requirement with respect to
*secured* impaired creditors] operates to provide alternatives—a
debtor may proceed under subsection (i), (ii), *or* (iii), and need
not satisfy more than one subsection.  This approach is consistent
with the definitions provided by the Code.  Section 102(5) provides
'that 'or' is not exclusive[.]' 11 U.S.C. § 102(5). The statutory
note to § 102(5) further explains that 'if a party 'may do (a) or
(b)', then the party may do either or both.'") (citations omitted).

Notwithstanding this apparently incorrect reading of the
statute, the Court will assume for purposes of this appeal that
Section 1129(b)(1)'s "fair and equitable" mandates that the Insider
Equity Holders received the fair market value of the equity interest
they were forced to sell, and, as such, the Bankruptcy Court was
required to value the reorganized debtors' stock.

1   Code requires that they receive the fair market value of their sold
2   stocks, the Insider Equity Holders argue, the Bankruptcy Court was
3   required to use certain valuation methodologies to assess the fair
4   market value of the stock of the reorganized debtor.  And, according
5   to the Insider Equity Holders, the valuation methodology employed by
6   the Bankruptcy Court—reference to the pink sheets—was reversible
7   error.  As noted above, see supra Section II, this issue—the use a
8   particular valuation *method*—is a legal matter, which this Court
9   reviews *de novo*.[21]

### B. Valuation

#### 1. Reliance on the Pink Sheets

    Contrary to the Insider Equity Holders' contention, the
Bankruptcy Court did not err in relying upon the pink sheet price in
assessing the value of the reorganized debtor's stock.  The Insider
Equity Holders argue that, in order to assess the value of the
reorganized debtor, the Bankruptcy Court was required to rely on an
expert's estimate of the value of the assets and debts, as well as
the future earning capacity of the reorganized entity.  This
assertion runs counter to the increasingly "strong preference for
market-based valuations."  COLLIER § 1129.05[3][b]; see also Bank of
Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S.
434, 457 (1999 ) ("[O]ne of the Code's innovations to narrow the
occasions for courts to make valuation judgments[.]").  As the Third

---

[21] The Insider Equity Holders do *not* argue here—nor did they in
the Bankruptcy Court—that, as a *factual matter*, the pink sheet price
of 45 cents a share was incorrect.

Circuit has held, "[a]bsent some reason to distrust it, *the market price is a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses.*" VFB LLC v. Campbell Soup Co., 482 F.3d 624, 633 (3d Cir. 2007) (internal citations and quotation marks omitted) (emphasis added); see also Matter of Prince, 85 F.3d 314, 320 (7th Cir. 1996) ("Due to the [difficulties in approximation that accompany an expert's valuation analysis], where market information is available, looking to the stock's 'fair market value'—what an arm's length buyer would be willing to pay for the stock on the open market—is generally the best means of gauging the stock's present value."); In re Iridium Operating LLC, 373 B.R. 283, 346 (Bankr. S.D.N.Y. 2007) ("A company's stock price is an ideal datapoint for determining value.") (internal citations and quotation marks omitted).  Indeed, in other contexts, courts have held that pink sheet values are an accurate assessment of the true value of a stock.  See, e.g. Hurley v. Fed. Deposit Ins. Corp., 719 F. Supp. 27, 33 (D. Mass. 1989) (holding that pink sheets accurately reflect the value of stock, so long as the market for the stock is able to "obtain[] material information about a company and accurately reflect[] that information in the price of the stock").

       The Insider Equity Holders argue that stock price upon which the Bankruptcy Court relied—45 cents a share—was not reliable because the shares were thinly traded and because the Bankruptcy Court only relied on the price on one day—May 18, 2011.  As an initial matter, this contention ignores the fact that the Bankruptcy Court also relied upon at least one other sale of MMPI stock in which 300,000 stocks were sold for $.50 just three months

beforehand.   In addition, the Bankruptcy Court relied upon the statement of OEC Chairman Stephen Taylor, who testified that *35 cents a share* was "the price on which a buyer and seller would agree in an arm's length transaction."   Moreover, in opposition to Charlestown's valuation evidence, the Insider Equity Holders offered nothing more the testimony of M. Freddie Reiss, whose estimate of the stock price was based on the *Insider Equity Holders'* own self-serving estimates of the true value of the reorganized corporation. Reiss's declaration contains no indication of how he, or the Insider Equity Holders, arrived at their conclusion that $278 million was the proper value of the reorganized debtor, rendering this valuation evidence (at the very least) suspect.

## 2. The Competitive Bidding Process

Moreover, any argument that the stock price did not accurately reflect the value of the reorganized debtor is belied by confirmation *process* employed by the Bankruptcy Court.   Namely, *by permitting more than one group to propose a plan*, the Bankruptcy Court tested the value of the reorganized debtor *against the market*. Such valuation, the Supreme Court has concluded, is the "best way to determine value."   Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 457 (1999);[22] see also COLLIER §

---

[22] LaSalle involved the "new value" corollary to the absolute priority rule, which arises when a plan allows "stockholders in the business that had filed for bankruptcy protection (old equity) to receive stock in the reorganized debtor in exchange for contributions of added capital (new value) . . . even though a senior class was not paid in full."   In re Bonner Mall P'ship, 2 F.3d 899, 906 (9th Cir. 1993).   Such plans may, under "certain conditions," be found "fair and equitable" and in compliance with the absolute priority rule.   Id.   The instant case does *not*

1129.05[3][b] ("In questionable cases, the price offered should be
checked by independent means . . . . [including] a competitive
bidding process to determine the price that a good fai[th] purchaser
would pay."); <u>Prince</u>, 85 F.3d at 320 ("[W]here stock is traded
infrequently (or only once), recent sales may not be as reliable an
indicator of current value as the equilibrium market price for a
stock that is heavily traded . . . [h]owever, here [the buyer and
seller] negotiated the stock's sale price at arm's length . . . *as a
result, the agreed-upon purchase price is likely to represent a
reasonably accurate estimation of the present value* [of the present-
day value of stock of a bankrupt corporation]").

    Although it did not explain its actions in these terms, the
Bankruptcy Court, in effect, conducted a competitive bidding process
for the reorganized debtor.  The Bankruptcy Court permitted three
separate groups—the Insider Equity Holders, Charlestown, and the
Legendary group—to propose plans, and with each iteration of a plan,
the parties effectively bid more for the reorganized debtor.  The
very first plan proposed by the Insider Equity Interests *eliminated
pre-petition equity interests entirely*, and permitted an investor to
receive 100 percent of MMPI in exchange for $10 million.  ER 1830 ¶
11.  Before any other entity was permitted to file a plan, the
Insider Equity Holders filed a series of amended plans; their best
treatment of equity came in their July 10, 2010 propose, in which

implicate the new value corollary because there is no dispute that a
creditor was not paid in full while an equity owner retained value
in the reorganized debtor.  Rather, the instant case involves a
dispute between two groups of equity holders, in which one argues
that it got less than its fair share of the reorganized debtor.

17

1   they gave equity holders the option of selling their shares for 8
2   cents a share or purchasing for seven cents a "number of shares in
3   reorganized MMPI equal to the number of existing shares they held in
4   MMPI." ER 1831. Once the Bankruptcy Court permitted Charlestown to
5   file a Plan, the proposed treatment of equity improved remarkably:
6   in its July 14, 2010 plan, Charlestown permitted pre-petition equity
7   holders to receive 16 cents a share, ER 1832; in their September 21,
8   2010 plan, the Insider Equity Holders permitted pre-petition equity
9   holders to receive 25 cents a share, ER 1833; and in their October
10  14, 2010 plan, Charlestown permitted shareholders to receive 35
11  cents a share, ER 1834. This type of bidding process has been
12  explicitly endorsed by the Supreme Court as the "best way to
13  determine [the] value" of a reorganized debtor. See LaSalle, 526
14  U.S. at 458 (holding that the value of a reorganized debtor may be
15  assessed wither by giving competing interests the opportunity to
16  "offer competing plans" or by giving competing interests the "right
17  to bid" for the equity in the reorganized debtor); see also COLLIER §
18  1129.04[3][b] ("[T]he plan may call for the acquisition of the
19  [reorganized debtor] by a third party, and the plan will call for
20  the equity interests [in the reorganized debtor] to be issued to the
21  third party in exchange of the consideration the third party is
22  offering. In this case, the bankruptcy court will have to assess
23  the transactions to ensure that the price being paid and the manner
24  in which the acquisition is being made is fair. *In a competitive*
25  *bidding situation . . . the court will be able to rely upon this*
26  *market mechanism to provide evidence of such fairness*.") (emphasis
27  added).
28

1    In other words, the competitive bidding process employed by the

2 Bankruptcy Court reduces any concern that the pink sheet price

3 undervalued the reorganized debtor's stock. So too does the

4 Bankruptcy Court's finding that the Final Charlestown Plan was the

5 best deal available to *both creditors and equity interests*.

6 Pursuant to Section 1129(c), the Bankruptcy Court was required to

7 "consider the preferences of creditors and equity security holders

8 in determining which plan to confirm" because there were two plans

9 proposed during the bankruptcy process. 11 U.S.C. § 1129(c). In

10 this case, the Bankruptcy Court held that the Final Charlestown Plan

11 was preferable to the Final Insider Equity Holders' Plan because the

12 former plan "encompasse[d] agreements with $70 million of secured

13 debt which still must be crammed down in order for the [final

14 Insider Equity Holders' plan] to be confirmed. An additional $60

15 million of secured debt which has accepted both plans has express to

16 the Court that it 'strongly' prefers the [Final] Charlestown Plan.

17 The [Final] Charlestown Plan also encompasses *certain* settlements

18 and compromises that the [Insider Equity Holders] have *chosen not* to

19 make." ER 1891. Moreover, the stock price offered to equity

20 interests under the Final Charlestown Plan—35 cents a share—was

21 better than the stock price offered to equity interests under the

22 Final Proposed Insider Equity Holders Plan—25 cents a share. See ER

23 1833-1834. Finally, the Non-Insider Equity holders "voted

24 overwhelmingly in favor of the Charlestown Plan and [their] official

25 representative, the OEC, strongly supports confirmation of the

26 Charlestown Plan." ER 1890. The Bankruptcy Court's finding that

27 the Final Charlestown Plan satisfied the "best interests of

28 creditors" *and* Non-Insider Equity Holders—a finding *not* appealed by

the Insider Equity Holders—is further evidence that the Insider Equity Holders got as much as they were entitled to once creditors were made whole.  See Bruce A. Markell, Owners, Auctions, and Absolute Priority in Bankruptcy Reorganizations, 44 STAN. L. REV. 69, 121 & n.306 (1991) ("If the [competitive bidding process is] followed, creditors may receive two plans simultaneously . . . . [I]f there are more than two plans, creditor preferences should again control.") (citing 11 U.S.C. § 1129(c)).

Indeed, the Insider Equity Holders' argument that they got less than the fair market value of their shares is belied by their own action (or inaction) in this case.  An example shows why.  The Insider Equity Holders repeatedly argue that, based on *their own* estimates, the "net equity value" of the company was approximately $278 million.  If this was the true value of the reorganized debtor, a 55 percent ownership stake in the corporation would have been worth $152.9 million.  However, the Final Charlestown Plan (as proposed) would have given MMPI Acquisition a 55 percent share in the reorganized debtor for a mere $16.9 million.[23]  Thus, according to the Insider Equity Holders' equity estimate, the Final Charlestown Plan (as proposed) would have rewarded MMPI Acquisition with a $136 million windfall.

However, *the Insider Equity Holders themselves* failed to propose a plan superior to the Final (proposed) Charlestown Plan. Given the alleged $136 million windfall coming to MMPI Acquisition,

---

[23] There were approximately 88 million shares of stock; and purchasing 55 percent of those shares (48.4 million) at 35 cents a share would have cost MMPI Acquisition approximately $16.9 million.

1   the Insider Equity Holders would have had every incentive to make a
2   more competitive bid *were the reorganized debtor in fact worth $278*
3   *million*, yet they did not.  Were the Insider Equity Holders'
4   valuation estimates accurate, they could have proposed a plan that
5   would have paid off the remaining secured claims that were impaired
6   under their final proposed plan (approximately $70 million worth of
7   claims), and still given each pre-petition equity holder a total of
8   $1.10 a share.  Moreover, had they in fact proposed such a plan, the
9   Bankruptcy Court would have been compelled to choose it over the
10  Final (proposed) Charlestown Plan pursuant to the best interests of
11  creditors test.  The Insider Equity Holders' failure to propose a
12  superior plan—one that reflected the $278 million valuation figure
13  they argue was correct—severely undermines their argument that MMPI
14  Acquisition received their share of the reorganized debtor on the
15  cheap.

16
17          **C. Procedural Defects**

18       In addition to their substantive argument, the Insider Equity
19  Holders argue that the Bankruptcy Court erred in relying upon the
20  pink sheets because they were not submitted as part of the record,
21  and because the Bankruptcy Court did not give them sufficient time
22  to prepare arguments and evidence as to why the pink sheet price was
23  incorrect.  Although the Bankruptcy Court gave the Insider Equity
24  Holders only a limited opportunity to dispute the pink sheet price
25  at the May 19, 2011 hearing, it gave further consideration to the
26  Insider Equity Holders' valuation arguments when it considered, and
27  rejected, the Insider Equity Holders' motion for reconsideration on
28  the valuation methodology it employed.  ER 1991-1992.  In addition,

1  it was not erroneous for the Bankruptcy Court to take judicial

2  notice of the pink sheet price. See In re NAHC, Inc. Sec. Litig.,

3  306 F.3d 1314, 1331 (3d Cir. 2002) (affirming a district court's

4  taking of judicial notice of stock price); Johnson v. Wiggs, 443

5  F.2d 803, 806 (5th Cir. 1971) (noting that pink sheet quotes are "in

6  the public domain"); see also Fed. R. Evid. 201(b)(2) (permitting

7  judicial notice of facts that are "capable of accurate and ready

8  determination by resort to sources whose accuracy cannot reasonably

9  be questioned"). Indeed, the Insider Equity Holders do *not* argue

10 that the Bankruptcy Court inaccurately recorded the pink sheet

11 price; only that the use of the price itself was a faulty

12 methodology. Their argument is *legal*, *not* factual.

13     Moreover, any procedural irregularity in this case was harmless

14 error. The Insider Equity Holders do *not* dispute that they were

15 given ample opportunity to respond to and present arguments as to

16 why the Final Proposed Charlestown Plan's 35 cents a share proposal

17 was inaccurate. In other words, the procedural irregularities

18 identified by the Insider Equity Holders *benefitted* them, rendering

19 these alleged errors harmless. See United States v. 191.07 Acres of

20 Land, 482 F.3d 1132, 1137 (9th Cir. 2007) ("The district court erred

21 by applying a valuation method to which no one testified and which

22 lacks a basis in the record. However, the compensation awarded on

23 the district court's theory was higher than it would have been if

24 the district court had accepted [an expert's] approach. The error

25 was harmless."); see also Boyd v. City & Cnty. of San Francisco, 576

26 F.3d 938, 943 (9th Cir. 2009) ("A party seeking reversal for

27 evidentiary error must show that the error was prejudicial[.]").

28

1

**IV.   CONCLUSION**

2       For the reasons put forward in this Order, the Bankruptcy

3   Court's decision is AFFIRMED.

4   IT IS SO ORDERED

5

6   August 7, 2013
    DATE                        THE HONORABLE STEPHEN V. WILSON
7                               UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28